IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 10, 2023 Session

## STATE OF TENNESSEE v. GEORGE WELLS

**Appeal from the Criminal Court for Davidson County**
**No. 2020-A-145    Cheryl A. Blackburn, Judge**

_____

### No. M2022-01561-CCA-R3-CD

_____

The Defendant, George Wells, pleaded guilty to reckless homicide with an agreed-upon sentencing range of two to five years. Following a hearing, the trial court denied the Defendant's request for diversion or any other form of alternative sentencing and imposed a five-year incarcerative sentence. The Defendant appeals the trial court's sentencing decision, challenging the length, manner of service, and denial of judicial diversion. After review, we determine that the trial court abused its discretion by failing to consider and weigh all of the relevant judicial diversion factors and by utilizing an improper factor. Based upon our de novo review of the judicial diversion factors, the trial court's judgment is reversed, and the Defendant's request for judicial diversion is granted. The matter is remanded to the trial court for the imposition of a term and the conditions of judicial diversion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;
Case Remanded**

KYLE A. HIXSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

Martesha Johnson Moore, District Public Defender; and Emma Rae Tennent (on appeal), Jonathan F. Wing (at hearing), and Chris Street-Razbadouski (at hearing), Assistant District Public Defenders for the appellant, George Wells.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Ronald Dowdy, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I.   FACTUAL AND PROCEDURAL HISTORY

On January 24, 2020, the Davidson County grand jury indicted the Defendant for reckless homicide, a Class D felony, and tampering with evidence, a Class C felony.  *See* Tenn. Code Ann. §§ 39-13-215, -16-503.  Subsequently, on July 28, 2022, the Defendant pleaded guilty to reckless homicide, and the State dismissed the tampering with evidence charge.  Pursuant to *Hicks v. State*, 945 S.W.2d 706 (Tenn. 1997), the Defendant, a Range I, standard offender, agreed to a sentencing range of two to five years for his reckless homicide conviction.[1]  The trial court was to determine at a separate sentencing hearing the length of the sentence and the manner of service, including the propriety of the Defendant's request for judicial diversion.

At the guilty plea hearing, the State provided the following facts in support of the Defendant's plea:

> [O]n October 13th, 2019, the victim Rickey Scott and the [D]efendant . . . were enrolled as students at Tennessee State University ["TSU"].  On that date, they entered their dormitory in the morning hours, along with a couple of other males.  They were observed on the surveillance video.  The group of males were carrying certain items that couldn't clearly be determined by the video.
>
> At approximately 10:48 a.m., the [D]efendant and Mr. Scott and Mr. Scott's roommate Clarence Williams, who was also with that group, entered into Mr. Scott and Mr. Williams' shared dorm room.  The three of them were inside that room for a period of time until approximately eleven a.m., where an individual who was walking down the hallway heard what he believed to be a loud shot.  He went and retrieved the dorm resident assistant, who came and checked on them.  The resident assistant looked into the room, asked them what was going on, was unable to determine if anything was wrong . . . . .

---

[1] *Hicks* held that an offender may negotiate a plea agreement for a sentence encompassing one range for release eligibility purposes but another range for determining the length of sentence.  945 S.W.2d at 709.  The sentencing range for a Range I, standard offender convicted of a Class D felony is typically two to four years.  *See* Tenn. Code Ann. § 40-35-112(a)(4).  Here, the Defendant agreed to increase his potential exposure to five years.

Shortly after, Mr. Scott left the dorm room and went to the bathroom and came back on his own accord. A while later, he left the dorm room and went to the bathroom again. As he was coming back out, he collapsed in the hallway.

Subsequent investigation revealed that the reason that Mr. Scott collapsed was that he was shot by the [D]efendant with a gun that the [D]efendant and Mr. Williams described as being what they believed to be a pellet gun. The autopsy revealed that, indeed, it was a real gun, a .22 caliber weapon. During the interview with Mr. Williams and the [D]efendant, detectives learned that the [D]efendant had a weapon that opened at the top much like a pellet gun, but was indeed an actual .22 caliber weapon. He opened it and closed it a couple of times and while doing that, had pointed the gun in the direction of the victim, Mr. Scott. The gun went off, striking him in the abdomen and subsequently leading to his ultimate death.

The Defendant stipulated that these facts were "generally true." The trial court accepted the Defendant's plea, finding it to be voluntarily entered.

A sentencing hearing was held on September 21, 2022. At the outset of the hearing, the trial court noted the following plea agreement details:

The range of punishment is two to five years. His range would have been two to four years, but he, as part of this plea, is two to five years. The court is going to determine the length of the sentence and whether or not there is any kind of possible probation or whether there's a special probation. That's what the court is going to be doing.

The trial court admitted as an exhibit the Defendant's presentence investigation report prepared by the Tennessee Department of Correction ("TDOC"). At the time of preparation of the presentence report, the African-American Defendant was twenty-one years old and single. The report reflected that the Defendant had graduated high school in Chicago, Illinois, before moving to Tennessee to attend TSU. The Defendant indicated to the presentence officer that his major was mechanical engineering and that he had completed three semesters of college for a total of thirty-two credit hours. According to the report, the Defendant was no longer a student at TSU due to the incident involving the victim, but the Defendant reported that he was "trying to appeal" to be readmitted. The Defendant's criminal record included one Davidson County, Tennessee charge for resisting arrest on February 27, 2020, which charge was later nolle prosequied.

- 3 -

Relative to the Defendant's work history, the Defendant indicated to the presentence officer that he had participated in a summer internship for structural engineering with Chicago Transit Authority and that he had worked at United Parcel Service and a pizza restaurant when he lived in Chicago. At the time of the report, the Defendant stated that he was not working and was living with a friend in Nashville. The Defendant said that he relied on student loans for support.

The Defendant reported to the presentence officer that both his physical and mental health were good. The Defendant indicated that his childhood was "rough," that his family did not have much money, and that his father was not involved in his life. He also indicated that he had been shot two years ago, leaving a large scar on his stomach and causing him to be nervous and avoid large crowds. However, the Defendant said that he was still active and played basketball. The Defendant told the presentence officer that he first drank alcohol around the age of nineteen but indicated that he did not drink much. He reported that he used marijuana daily, with his last usage being the day before his August 23, 2022 interview for the presentence report. The presentence officer advised the Defendant to quit and informed him that there would be drug tests on probation. The Defendant stated to the presentence officer that he had never attended any kind of drug treatment program.

The presentence report contained the TDOC's validated risk and needs assessment of the Defendant. The assessment resulted in a risk score for the Defendant of "high" for violence and a "high or moderate" need in the categories of aggression, residential, alcohol and drug use, family, and friends. In addition, the risk and needs assessment scored the Defendant "low" in the employment, attitudes and behaviors, education, and mental health categories. It was recommended that if the trial court were to order a sentence involving release into the community, the Defendant be placed in a cognitive based intervention program, he receive an assessment by a forensic social worker to determine his need for drug and alcohol or mental health treatment, and he take part in the "Community Resource Center."

Next, the trial court heard victim impact evidence. The trial court admitted multiple letters from various individuals wherein they described the impact that the victim's death had on them—letters from the victim's parents, grandparents, a great grandparent, sister, aunts, and cousin, as well as letters from the victim's friends, a previous principal, and two prior coaches. The victim's mother, father, sister, and grandmother read their victim impact statements for the trial court and expressed the magnitude of their loss. The victim's grandfather gave a brief statement as well, though he did not submit anything in writing.

The defense presented a sentencing hearing memorandum that had been prepared by a Client Advocate with the Public Defender's Office. The memorandum recounted the Defendant's social history, including "a positive and supportive relationship with his family"; his academic history, including his graduating as salutatorian from his high school and receipt of scholarships for college; his desire to become an engineer, including his invention of a "concussion helmet" and college studies in thermodynamics and rocketry; his health history, including his being shot at least six times in a drive-by shooting in Chicago on June 21, 2020, as he was about to enter a convenience store; his mental health history, including his being seen by a crisis counselor following the incident in this case; and his employment history, including his obtaining two jobs since returning to Nashville. The advocate noted that the Defendant had "expressed deep remorse for the incident that occurred at TSU" and included a poem written as an expression of remorse by the Defendant.

Letters of support from a prior principal of the Defendant's and from the Defendant's grandmother were attached to the memorandum. Additional letters written in support of the Defendant were also admitted as an exhibit—letters from a college friend, a father of one of the Defendant's friends, and the "Director of AOC Commercial Operations" at Collins Aerospace. The trial court also heard testimony from several defense witnesses.

Mr. Lawrence Noble, Jr., a firefighter and EMT with the Chicago Fire Department, testified that he had known the Defendant for approximately nine years, since his son and the Defendant were friends in the eighth grade and played sports together. Mr. Noble said that his first impression of the Defendant was that "he was a very respectful young man" and that he was always positive, kind, and smiling. Mr. Noble described the Defendant as "the type of young man that [he] would like [his] sons to hang around." Mr. Noble told the trial court that the Defendant had grown up in a "rougher area" of Chicago where gangs and poverty were prevalent and that he was proud of the Defendant for overcoming his difficult circumstances. Mr. Noble also said that the Defendant was "a great student" and noted that the Defendant had received an academic scholarship to college. When he spoke with the Defendant about the victim's death, the Defendant was "extremely solemn" and "very remorseful." Mr. Noble had traveled from Chicago to support the Defendant and his letter had been admitted as an exhibit.

Ms. Gale Smith, the Defendant's grandmother, described the Defendant as "a quiet child," "very studious," "a rather voracious reader," and "athletically gifted." She testified that the Defendant lived with her for approximately two years when he was a child while his mother was incarcerated. She told the trial court that the Defendant was the salutatorian

of his high school class and received a full academic scholarship to TSU. Ms. Smith believed that, based upon her interactions with the Defendant, he was very remorseful for what had happened to the victim. Since the victim's death, the Defendant had become "even more quiet" and did not go out much, according to Ms. Smith. Ms. Smith said that the victim's death had "dramatically impacted" the Defendant's behavior and attitude and that he had matured considerably. She believed her grandson was "particularly determined" and could successfully complete a probationary term and "use his talents to be[come] a productive citizen, if give[n] that opportunity." According to Ms. Smith, after the victim's death in October 2019, the Defendant had returned to Chicago for a time where he had "a little job," but he had since returned to Nashville and was working two part-time jobs. Her letter in support of the Defendant had also been admitted as an exhibit.

Ms. Summer Steele testified that she attended TSU, that she worked at Dutch Bros, and that she had met the Defendant through a mutual school friend. Ms. Steele, who was presently twenty-eight years old, and the Defendant were roommates. She described her relationship with the Defendant, whom she had known for about one and one-half years, as platonic, saying that he was like "a little brother." According to Ms. Steele, the Defendant had "matured a lot" during the time she had known him, and he was definitely "taking things more seriously now." Ms. Steele indicated that the Defendant was currently working two jobs—one at Dutch Bros with her, and then another at Craft Axe Throwing. She stated that the Defendant was working almost every day and that he was trying to "do[] whatever he [could] to get back in school," including reapplying for financial aid. Ms. Steele told the trial court that the Defendant did not have a driver's license, but she would help the Defendant get to any appointments if he was granted release into the community, including attendance in treatment or counseling. She asked the trial court, in sentencing the Defendant, to consider the Defendant's age at the time of the offense and his potential future.

Ms. Steele testified that she and the Defendant had spoken often about the victim's death, that the Defendant was very remorseful over the loss of his friend, and that the Defendant had not given her indication he was "not taking this death seriously[.]" According to Ms. Steele, the Defendant thought about the victim "all the time" and talked about how much he missed his "best friend," including "wish[ing] he would've called the ambulance or just done so many things differently." Ms. Steele indicated the Defendant did not call for an ambulance because he was scared and did not want to get into trouble.

The Defendant testified that he was currently twenty-one years old and that he was eighteen years old at the time of the victim's death. The Defendant indicated his understanding that his actions led to the victim's death and said he was "[e]xtremely sorry,"

"[g]ravely so," for what had happened to the victim. According to the Defendant, he thought about the victim every day, and if he had it to do over again, he "would not hesitate to call the ambulance" sooner. The Defendant reiterated that the group thought it was a pellet gun, but he said that even still, they should have paid better attention to the victim's pain. He acknowledged that he had caused the victim's family immeasurable pain by his actions.

The Defendant testified that he grew up in Chicago, Illinois, was raised by his mother and grandmother, and had three siblings. The Defendant said that he did not know his father growing up and that his mother had been incarcerated for two years when he was a child. He described the neighborhood where he lived with his mom as being "one of the most dangerous parts of Chicago." When he was in seventh grade, he began taking high school level classes, and he enjoyed learning about math and science. While in school, the Defendant played various sports, including football, basketball, track, and baseball. The Defendant told the trial court that he graduated high school as the salutatorian of his class with a 3.8 GPA. During high school, the Defendant was selected for an engineering internship by Northrop Grumman, a Boeing competitor. According to the Defendant, he received an academic scholarship to TSU where he studied mechanical engineering with a concentration in thermodynamics. He further relayed that he hoped to return to college.

The Defendant testified about his being shot while living in Chicago. He affirmed that he was not engaged in any criminal activity at the time he and a friend were shot but that they were simply leaving a store. The Defendant was in the hospital for two and one-half months after the shooting receiving treatment for his injuries. The Defendant said he cooperated with the police in attempting to locate the individual who shot them, but the police never contacted him further, and no arrest was made.

The Defendant described the victim as his "best friend." He said that the victim was his closest friend at TSU and that they bonded over their shared engineering major. They met playing basketball and "just clicked."

The Defendant described the circumstances leading to the victim's death. He told the trial court that he went to an off-campus party with the victim and other friends the night before the shooting. After the party's hostesses had "passed out," the group took a gun, a watch, and shoes from the house. According to the Defendant, the victim was the one who took the gun from the house, and the Defendant did not know why the victim took it because it looked "fake." The Defendant, the victim, and the victim's roommate returned to the victim's dorm room the following morning and laid out all of the items that they had

taken on one of the beds to examine them. The Defendant admitted that the group planned to sell the items at a pawnshop for money.

The Defendant said that he looked at the gun and thought it was a toy. He claimed that the victim played with the gun first but that the victim then asked him to figure out how the gun and its safety mechanism worked. The Defendant explained that he thought the gun was fake because when they "were trying to figure it out, . . . it broke in half." The Defendant indicated that the bullets had to be "drop[ped]" into the gun, and "it was super small[.]" He said that while talking with the victim and divvying up the items, he was trying to figure out how the gun worked, and in so doing, pulled the trigger. He further described, "When I opened it the first time, I guess it had like a safety mechanism so you couldn't pull it at first. It was like hard. And I snapped it open and snapped it back, and at that time it went off." The Defendant reaffirmed that he believed that he had shot the victim with a pellet gun.

The Defendant indicated that the victim "wasn't even bleeding" after the shot and that no one in the group realized the seriousness of the victim's injury. The Defendant stated that the victim had fallen when he was shot but that he "popped right back up" and continued talking. They searched for the pellet believing it had "bounced to the floor" but could not find it. The Resident Assistant ("RA") came to the dorm room to check on the noise that emanated from inside, and the victim's roommate told the RA "that [they] were wrestling and somebody fell off the bed[.]" After the RA left, the Defendant went to the bathroom and got the victim some water to drink because the victim said his stomach hurt. When the Defendant was asked why they did not call an ambulance sooner, the Defendant replied, "Because we all agreed that if they came in and found the stuff that we stole, we would lose our scholarships. We were more worried about getting kicked out of school[.]"

According to the Defendant, the group continued to talk for approximately thirty more minutes or so before the victim said he had to go to the bathroom. As the victim stood up from the bed, the Defendant noticed that the victim was "weak in the legs" and could not support his weight. The Defendant opened the door for the victim, who left the dorm room and proceeded to the bathroom. The Defendant thought it was taking the victim "forever" to use the bathroom, so he went to check on him. As the Defendant did so, he encountered another student, who told the Defendant that they had been in the bathroom and seen blood running down the victim's leg through the stall. The Defendant stated that he immediately alerted the RA to call an ambulance at that time. According to the Defendant, the paramedics took a long time before arriving to administer aid to the victim, likewise, seemingly not understanding the severity of the situation.

The Defendant admitted that he removed certain items from the victim's dorm room after the shooting in case the police chose to search the room. The Defendant denied that he took the gun from the room and said that he did not know what happened to it. The Defendant admitted that he had lied to the police when he initially spoke to them. According to the Defendant, the group had devised a story to protect their scholarships and not get "kicked out of school": "[T]he story was we all had got drunk and did a few things the night before, and [the victim] was having a reaction to what we had did the night before." The Defendant maintained that he told the police the truth after he learned that the victim had died. In addition, the Defendant confirmed that he took a Nike jacket as a "piece of memorabilia" from the victim's room following the victim's death.

According to the Defendant, the victim's death had affected him tremendously, and he could no longer "be around big crowds of people." The Defendant indicated that he was deeply remorseful for his actions, and he explained that he did not reach out to the victim's family based upon the advice of his attorneys. The Defendant had also met with the assistant district attorney during a courtroom proceeding and expressed his sorrow and desire to talk with the victim's family; however, the Defendant was told that "it wouldn't be a good idea."

The Defendant said that he initially returned to school after this incident but that he ultimately lost his scholarship due to these events. The Defendant said that he had applied for financial aid and was trying to reenter TSU. The Defendant confirmed that he was presently working with Craft Axe Throwing and as a barista at Dutch Bros with Ms. Steele. According to the Defendant, he was working every day. The Defendant stated that if able, he wanted to returned to college and study thermodynamics in the hopes of working for Northrop Grumman on airplanes. The Defendant expressed a desire to invent things and be creative. However, the Defendant indicated that he would be unable to work for such a company with this conviction on his criminal record. He indicated that going forward, his goal was to finish school, in part as a way to honor the victim's memory.

The Defendant testified that he was not currently using any drugs and that he could pass a drug screen. The Defendant admitted that he had used marijuana and ecstasy to "cope" with the victim's death while he was on bond for this case. Although he understood that he was not supposed to get in trouble while he was on bond, the Defendant claimed that he did not realize he should not use illegal substances during that time, noting that he "didn't have any stipulations." He was honest with the presentence officer about his prior drug usage, and he indicated his understanding that such would not be tolerated if he was granted an alternative to incarceration. The Defendant averred that he would successfully complete all terms and conditions of his probation.

- 9 -

The Defendant stated that he did not own a gun and had not possessed a gun since he had been released on bond. The prosecutor then requested to show the Defendant a photograph from a Facebook profile showing an image of a masked young man holding a gun in one hand and pointing to it with the other. Defense counsel indicated that this was the first he had seen the photograph. The trial court then asked for details about the photograph known to the prosecutor. The prosecutor averred that the image was captured by the victim's mother, who provided that it had been posted to the Defendant's Facebook profile on March 28, 2022. The Defendant spontaneously said, "That picture is an old picture." The trial court observed that the image was undated, and the prosecutor indicated that he had not verified the date the image was posted. The prosecutor explained that he intended to question the Defendant further to establish more details surrounding the photograph. Defense counsel objected, stating, "Your Honor, I object. I don't think this is the proper foundation." The trial court overruled the objection, responding, "Well, I guess you can ask him. The problem is that it doesn't tell me when or what. So, I guess ask him a question. But the weight is going to be little, if any."

Upon further questioning by the prosecutor, the Defendant indicated that he posted this picture to an "old" Facebook profile, which was under the name George L. Wells, Jr. However, the Defendant confirmed that it was a valid account in March and April of 2022. The Defendant denied that he was the person in the image and averred that he did not know the identity of the individual. When asked why he had posted the image to his Facebook account, the Defendant explained, "I don't know. I was trying to portray an image[, but] . . . I'm not a gangster." The Defendant said that in the area of Chicago where he grew up, one could not "survive without a gun" because "even innocent bystanders [were] shot." When asked why "if [the victim's death] was such a horrible experience, why would [he] even have a picture of somebody having gun," the Defendant responded, "Honestly, I couldn't give you an answer that makes sense. It was just me being a dumb kid." According to the Defendant, no one told him that he could not have a gun. The Defendant indicated that his new Facebook profile more accurately portrayed his current image, rather than that of an immature eighteen-year old. The prosecutor asked to admit the image into evidence, and defense counsel again objected. The trial court overruled the objection, finding that the Defendant had identified the image as one that he had posted to his Facebook profile, and noting, "The point is that any possession of a gun after the event is something that I find interesting."

At the conclusion of the sentencing hearing, the trial court stated,

[T]he issues are length of sentence, and his range is two to five. He agreed to go to five. The reckless endangerment for a Range 1 offense is two to four, but he agreed to go to five. And the issue is also whether or not he's probation or sentence for service or diversion [sic]. So it's three things I have to decide.

After hearing the arguments of the parties, the trial court said that it was going to take the matter under advisement, so it could review all of the evidence.

At the outset of its ruling on October 7, 2022, the trial court noted that the Defendant had agreed to a "range of punishment of . . . two to five years" and that his agreement "to go up to five years" was out-of-range for a Range I, standard offender. The trial court further stated that in rendering its sentencing determination, it had considered the presentence report, the evidence adduced at the sentencing hearing, the Defendant's statement, the arguments of the parties, the nature and characteristics of the crime, applicable enhancing and mitigating factors, any statistical information provided by the Administrative Office of the Courts, the principles of sentencing, and "all matters required by Sections 40-35-102 and 40-35-210 of the Tennessee Code."

The trial court first considered the enhancement and mitigating factors. *See* Tenn. Code Ann. §§ 40-35-113, -114. The trial court applied enhancement factor (1), that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the range. In applying this factor, the trial court observed that the Defendant had admitted that he and a group of friends stole the firearm used in this case during a party, which equated to the crime of theft. The trial court also mentioned that the Defendant had admitted to stealing shoes and a watch from this home and to going through the victim's dorm room after the shooting to get rid of certain items in case the room was later searched. In addition, the trial court noted that the Defendant had admitted to using illegal narcotics while on bond for this offense. The trial court also applied enhancement factor (9), that the Defendant possessed or employed a firearm during the commission of the offense. Relative to mitigating factors, the trial court found only factor (11) applicable, the Defendant, although guilty of a crime, committed the offense under such unusual circumstances that it was unlikely that a sustained intent to violate the law motivated his conduct.

Next, the trial court addressed the Defendant's request for judicial diversion. The court first identified the relevant *Parker/Electroplating* factors to be utilized in determining whether to grant judicial diversion. *See State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998).

- 11 -

The trial court, citing *State v. Washington*, 866 S.W.2d 950, 951 (Tenn. 1993), stated that it should also consider the Defendant's "attitude, his behavior since arrest, his home environment, current drug usage, emotional stability, past employment, general reputation, family responsibilities, and the attitude of law enforcement." In conducting its analysis, the trial court noted that the Defendant had admitted to using illegal narcotics while on bond for this offense. The trial court next stated that it was most concerned about the image posted to the Defendant's Facebook account of a masked young man's holding what appeared to be a gun. According to the trial court, the image was posted to the account in March or April of 2022. The trial court emphasized that the Defendant did not deny posting the image, though he claimed that it was not him and that he did not know the identity of the individual in the picture. In the trial court's view, such behavior while on bond for this incident, an incident in which the Defendant's friend had died, did not demonstrate that the Defendant had shown amenability to correction or that he had "learned anything from this tragedy." The trial court denied the Defendant's request for judicial diversion.

The trial court then addressed the Defendant's suitability for other forms of alternative sentencing. Citing Code section 40-35-102(6), the trial court stated that the Defendant had "the presumption of an alternative sentence" because he was convicted of a Class D felony as a Range I, standard offender. The trial court further observed that the State had "the burden of overcoming the presumption with evidence to the contrary" but that the Defendant had "the burden of establishing his suitability for full probation." *See State v. Bingham*, 910 S.W.2d 448, 455 (Tenn. Crim. App. 1995). The trial court again noted that it found the Defendant's conduct while on bond for this offense to be of "great concern" and determined that a probated sentence would be inappropriate. The trial court ordered the Defendant to serve his five-year sentence in confinement but indicated that it would consider suspending the remainder of his sentence to supervised probation if the Defendant successfully completed a six- to eight-month program that included "a component of anger management, substance abuse treatment, and a victim impact panel with no disciplinary write-ups[.]"

After the trial court announced its ruling, defense counsel asked if the Defendant did "very well" serving a portion of the sentence and completing the program, would the trial court "consider taking the 40-35 issue under advisement?" The trial court responded, "No. I am not going to do that. . . . I do not think, under the circumstances, that that is appropriate based on what I observed and what I saw." The trial court, further in response, observed, "And he can't do that anyway. I would have to take the whole thing under advisement, and that's not what I'm going to do." When defense counsel expressed concern about the Defendant's future as a convicted felon, the trial court said, "I know but that is—you know, someone died as a result of this." Defense counsel said, "That is true

in every homicide."  The trial court then described the situation as "very tragic" and remanded the Defendant into custody.

The trial court entered an order to that effect the same day, October 7, 2022.[2]  In the order, the trial court noted the following procedural history: "Mr. Wells is a Range I offender, and he pled out of range to 5 years, pursuant to *State v. Hicks*, 945 S.W. 2d 706. A sentencing hearing was scheduled to determine the manner of service and whether judicial diversion would be appropriate."

The Defendant filed a timely notice of appeal.  The case is now before us for our review.

## II.     ANALYSIS

On appeal, the Defendant challenges the trial court's sentencing determinations, taking exception to the imposition of the maximum sentence and the denial of judicial diversion and alternative sentencing.  The State responds that the trial court did not abuse its discretion in sentencing the Defendant.

The Sentencing Reform Act was enacted in order "to promote justice" and "assure fair and consistent treatment of all defendants by eliminating unjustified disparity in sentencing and providing a fair sense of predictability of the criminal law and its sanctions."  Tenn. Code Ann. § 40-35-102.  In determining the proper sentence, the trial court must consider: (1) the evidence adduced at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (6) any statistical information provided by the Administrative Office of the Courts ("AOC") as to Tennessee sentencing practices for similar offenses; (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report.  Tenn. Code Ann. § 40-35-210(b).

When an accused challenges the length of a sentence or manner of service, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness.  *State v. Bise*, 380 S.W.3d 682, 707

---

[2] From the transcript, it appears that the trial court, in large part, though not entirely verbatim, read its order at the October 7, 2022 hearing.

(Tenn. 2012); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the *Bise* standard to "questions related to probation or any other alternative sentence"). The *Bise* standard of review also applies to "appellate review for a trial court's sentencing decision to either grant or deny judicial diversion." *State v. King*, 432 S.W.3d 316, 325 (Tenn. 2014). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001).

## A. Judicial Diversion Legal Principles

We begin by addressing the Defendant's request for judicial diversion. Our supreme court has described judicial diversion granted pursuant to Tennessee Code Annotated section 40-35-313 as a "legislative largess." *State v. Schindler*, 986 S.W.2d 209, 211 (Tenn. 1999). Under the judicial diversion statute, a qualified defendant "enters a guilty or nolo contendere plea or is found guilty of an [eligible] offense without the entry of a judgment of guilty[,]" and "the plea or verdict is held in abeyance and further proceedings are deferred under reasonable conditions during a probationary period established by the trial court." *Rodriguez v. State*, 437 S.W.3d 450, 455 (Tenn. 2014) (citations omitted). If the defendant violates the conditions of judicial diversion, the trial court may "enter an adjudication of guilt and proceed as otherwise provided." Tenn. Code Ann. § 40-35-313(a)(2). If the defendant successfully completes his period of diversion, however, the trial court discharges the defendant and dismisses the proceedings without court adjudication of guilt or the entry of a judgment of guilt. *Id*.

"Judicial diversion stands in stark contrast to traditional criminal proceedings and by its plain language permits a qualified defendant a second chance without the stigma of a conviction." *Rodriguez*, 437 S.W.3d at 456. Stated another way, "[t]he purpose of judicial diversion is to avoid placing the stigma and collateral consequences of a criminal conviction on the defendant, in addition to providing the defendant a means to be restored fully and to useful and productive citizenship." *State v. Johnson*, 980 S.W.2d 410, 413 (Tenn. Crim. App. 1998) (citing *State v. Porter*, 885 S.W.2d 93, 95 (Tenn. Crim. App. 1994)). Tennessee Code Annotated section 40-35-313(a)(2) specifically provides that the discharge and dismissal "shall not be deemed a conviction for purposes of disqualifications or disabilities imposed by law upon conviction of a crime or for any other purpose, except as provided in subsections (b) and (c)." The defendant may also seek to have expunged "all official records . . . [any] recordation relating to the person's arrest, indictment or information, trial, finding of guilty and dismissal and discharge." Tenn. Code Ann. § 40-35-313(b). "The effect of the order is to restore the person, in the contemplation of the law, to the status the person occupied before the arrest or indictment or information." *Id*.

As such, judicial diversion is not a sentence; rather, the grant or denial of judicial diversion is simply a decision to defer a sentence or to impose one. *State v. Sheets*, No. M2022-00538-CCA-R3-CD, 2023 WL 2908652, at *4 (Tenn. Crim. App. Apr. 12, 2023) (citing *King*, 432 S.W.3d at 324-25), *no perm. app. filed*.

There is no dispute that the Defendant herein was eligible for judicial diversion. *See* Tenn. Code Ann. § 40-35-313(a)(1)(B). However, simply because a defendant meets the eligibility requirements does not automatically entitle him or her to judicial diversion. *State v. Bonestal*, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993). "Traditionally, the grant or denial of judicial diversion has been left to the sound discretion of the trial court." *King*, 432 S.W.3d at 323. When deciding whether judicial diversion is appropriate, a sentencing court must consider seven common-law factors in making its determination. Those factors are:

> (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as to others, and (g) whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused.

*Electroplating*, 990 S.W.2d at 229 (citing *Parker*, 932 S.W.2d at 958); *see also King*, 432 S.W.3d at 326 (reaffirming that the *Electroplating* requirements "are essential considerations for judicial diversion"). The trial court must weigh the factors against each other and explain its ruling on the record. *King*, 432 S.W.3d at 326 (citing *Electroplating*, 990 S.W.2d at 229). If the trial court adhered to these requirements, "the determination should be given a presumption of reasonableness on appeal and reviewed for an abuse of discretion." *Id*. at 319. This court will "not revisit the issue if the record contain[ed] any substantial evidence supporting the trial court's decision." *Electroplating*, 990 S.W.2d at 229; *see also Parker*, 932 S.W.2d at 958.

A trial court is "not required to recite all of the *Parker* and *Electroplating* factors when justifying its decision on the record in order to obtain the presumption of reasonableness." *King*, 432 S.W.3d at 327. However, "the record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific factors applicable to the case before it." *Id*. If the trial court "fails to consider and weigh the applicable common law factors, the presumption of reasonableness does not apply and the abuse of discretion standard . . . is not appropriate." *Id*.

- 15 -

B.    Adequacy of Trial Court's Findings

The Defendant contends that the trial court failed to properly weigh all required factors and articulate the specific reasons for its determination that the Defendant should not be granted judicial diversion.  Further, he contends that the trial court placed undue weight on an irrelevant factor that tainted its decision-making process.

The State argues that the trial court "acknowledged the requisite factors and additional criteria that it must consider in deciding whether a qualified accused should be granted judicial diversion."  The State then analyzes the judicial diversion factors and cites to other portions from the trial court's entire sentencing ruling, including findings regarding the circumstances of the offense made by the trial court in imposing the sentence length, to support the denial of diversion.

Despite the State's argument, we note that the trial court here addressed the sentencing issues individually.  It is true that the factors that a trial court considers in deciding sentencing issues can overlap substantially.  *See Sheets*, 2023 WL 2908652, at *5 (citing *State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017)).  However, these concepts and their underlying purposes are distinct, and we have recognized that a trial court should analyze the issues separately and differentiate between the various aspects of a sentencing decision.  *Id.* (citing *State v. Wilson*, No. W2019-01550-CCA-R3-CD, 2020 WL 6828966, at *6 (Tenn. Crim. App. Nov. 19, 2020)).  A trial court's failure to place this separate analysis on the record will remove the presumption of reasonableness from any review on appeal.  *See Wilson*, 2020 WL 6828966, at *4 ("If the trial court fails to consider and weigh the factors [in its judicial diversion analysis], the deferential standard of review does not apply.").

Here, the trial court identified the *Parker*/*Electroplating* factors before denying the Defendant's request for judicial diversion.  But the trial court's ruling was merely a recitation of those factors followed by a succinct analysis of the Defendant's drug usage and behavior since arrest, including the posting of the Facebook image, as it related to the Defendant's amenability to correction.  However, the trial court did not reference or mention any of the additional evidence presented at the sentencing hearing, of which there was an abundance.  The trial court failed to address or discuss any of the other factors in its analysis or make any indication regarding the weight of the various factors.  Accordingly, we conclude that the trial court failed to properly weigh all required factors and articulate the specific reasons for its determination that the Defendant should not be granted judicial diversion.  *See, e.g.*, *State v. Horn*, No. M2022-00615-CCA-R3-CD, 2023

- 16 -

WL 4624495, at *8 (Tenn. Crim. App. July 19, 2023) (concluding same under similar circumstances), *no perm. app. filed*.

Also, in rendering its decision to deny diversion, the trial court placed great emphasis on the Facebook image. During the sentencing hearing, the trial court, at the behest of defense counsel, examined the photograph and expressed concern about its value and authenticity, noting the lack of any date. The prosecutor simply told the trial court a witness had provided it to the State after seeing it posted to the Defendant's Facebook account on March 28, 2022. The defense objected to admission of the photograph. Ultimately, the trial court permitted questioning about the photograph but stated that it only intended to give the photograph little weight, if any. During questioning about the photograph, the Defendant acknowledged that he posted the picture in question to his "old" Facebook page. The prosecutor was able to confirm with the Defendant that he had used this previous Facebook account through March or April of 2022, but the prosecutor did not ask when the particular image in question was posted to that account.

Despite the trial court's initial reluctance to assign much weight to the image, the trial court ultimately identified the image as the primary factor in rejecting diversion. The trial court, in issuing its ruling, determined that the image was posted to the Facebook account in March or April of 2022. The trial court emphasized that the Defendant did not deny posting the image, though he claimed that it was not him and that he did not know the identity of the individual in the picture; in the trial court's view, the Defendant's posting of the image did not show that he had "learned anything from this tragedy." Regardless, the exact provenance of the image was never established, nor was the identity of the individual therein. Given the accidental nature of the conduct at issue here, the trial court's overwhelming emphasis on the Facebook photograph in its decision to deny diversion is not supported by the record.

Finally, while the trial court did not specifically examine the circumstances of the offense, the trial court was asked to take its judicial diversion decision under advisement, which it declined to do. When defense counsel expressed concern about the Defendant's future as a convicted felon, the trial court noted that the situation was "very tragic" and indicated that it found diversion inappropriate because "someone died as a result of this." The trial court did not identify any further reasons why or explain how the circumstances of the offenses weighed against diversion. This court has previously held that a trial court may not rest its decision to deny judicial diversion to a qualified defendant solely on the grounds that a victim died due to the defendant's crime. *See, e.g.*, *State v. Spang*, No. M2014-00468-CCA-R3-CD, 2015 WL 510921, at *4 (Tenn. Crim. App. Feb. 6, 2015) (holding that "[d]eath is always permanent in a homicide case and cannot be considered as a factor for denying diversion" but that "the circumstance leading to death can be

- 17 -

considered"). The legislature did not preclude reckless homicide from the list of crimes for which diversion is applicable. *See* Tenn. Code Ann. § 40-35-313(a)(1). We also conclude that the trial court's statement at the sentencing hearing, which did not engage in any additional review or analysis of the circumstances of the offense beyond the fact that a death occurred, reflects that its denial of diversion was influenced by an improper factor. *See, e.g.*, *State v. Turner*, No. M2013-00827-CCA-R3-CD, 2014 WL 310388, at *6 (Tenn. Crim. App. Jan. 29, 2014) (holding that the trial court abused its discretion when it "denied judicial diversion solely because a death was involved" and "did not review all of the relevant factors"); *State v. Claffey*, No. W2016-00356-CCA-R3-CD, 2016 WL 7239018, at *6 (Tenn. Crim. App. Dec. 14, 2016) (holding that the trial court improperly relied upon the evidence of the victims' deaths to deny judicial diversion when considering whether diversion would serve the ends of justice and "failed to identify any reasons why or explain how the circumstances of the offenses weighed against diversion").

For these reasons, the presumption of reasonableness does not apply to the trial court's judgment in this case, and the abuse of discretion standard is not appropriate. In this situation, the appellate court has two options: (a) it may conduct a de novo review to determine whether an adequate basis for the sentencing decision exists; or (2) it may remand the case for the trial court to consider the relevant factors in determining an appropriate sentence. *See State v. Higgins*, No. M2021-00281-CCA-R3-CD, 2022 WL 1207759, at *6 (Tenn. Crim. App. Apr. 25, 2022) (citing *State v. Pollard*, 432 S.W.3d 851, 864 (Tenn. 2013)), *no perm. app. filed*. In choosing between these alternatives, the appellate court may consider "the adequacy of the record, the fact-intensive nature of the inquiry, and the ability of the court to request supplementation of the record." *King*, 432 S.W.3d at 328.

We are persuaded that the circumstances of this case are appropriate for de novo review. The facts are not in dispute, and there have been adequate hearings, all transcribed in the record. The record is well-developed and is sufficient for this court to review the issues related to judicial diversion. Further, the charges in this case stem from an act that occurred in October 2019, over four years ago. In consideration of all the circumstances, we elect to conduct our own review rather than remand the case for the trial court's further consideration. *See King*, 432 S.W.3d at 328; *State v. Eakes*, No. M2022-01275-CCA-R3-CD, 2023 WL 5605636, at *9 (Tenn. Crim. App. Aug. 30, 2023), *no perm. app. filed*; *Horn*, 2023 WL 4624495, at *8; *Sheets*, 2023 WL 2908652, at *5; *State v. Shaffer*, No. E2017-02432-CCA-R3-CD, 2019 WL 328482, at *5 (Tenn. Crim. App. Jan. 24, 2019) (all conducting de novo review of a trial court's denial of judicial diversion where the record was sufficient to conduct review).

### C.     De Novo Review of Diversion Factors

#### 1.     Amenability to Correction

The first factor in the diversion analysis considers the accused's amenability to correction.  In analyzing a defendant's amenability to correction, the trial court may consider several factors, such as: (1) the defendant's acceptance of responsibility and remorse; (2) the defendant's compliance with release orders, including bail and probation conditions; (3) the results of a validated risk and needs assessment or a psychosexual evaluation; and (4) the defendant's drug usage and whether the defendant has sought treatment for a substance use addiction.  *Sheets*, 2023 WL 2908652, at *8 (citations omitted).  Some of these factors are relevant in this case.

The Defendant expressed acceptance of responsibility and remorse for his actions that led to the victim's death.  He indicated that he had been forever changed by the victim's death and thought about the victim daily.  The Defendant also presented several witnesses who spoke of his expressions of remorsefulness and the changes in his behavior and attitude since this incident.  The Client Advocate for the Public Defender's Office noted that the Defendant had "expressed deep remorse for the incident that occurred at TSU" and included with the sentencing memorandum a poem written as an expression of remorse by the Defendant.  The Defendant also stated that he wanted to talk to the victim's family but that he was told not to do so by his attorneys.  He further testified that while at a courtroom proceeding, he spoke with the assistant district attorney and indicated his desire to speak with the victim's family but that the assistant district attorney told him such would not be prudent.  In addition, the presentence report indicated that the Defendant had been seen by a crisis counselor following the incident in this case.

The validated risk and needs assessment of the Defendant resulted in a risk score for the Defendant of "high" for violence and a "high or moderate" need in the category of aggression.  However, the aggression factors considered in reaching that determination involved only this incident, and it was noted that the death was "accidental."

The trial court's decision to deny diversion focused solely on the Defendant's amenability to correction, noting that the Defendant had admitted, while on bond for this offense, to using drugs and to posting a photograph of a masked individual holding a gun on Facebook.  The Defendant admitted to his presentence report officer that he used marijuana daily, and the presentence report officer advised to him quit.  The Defendant also admitted at the sentencing hearing to using marijuana and ecstasy to cope with his part in the victim's death.  However, the Defendant said that he was not on "any stipulations"

while released on bond, and the record does not reflect any indication to the contrary. The Defendant, presumably following the advice of the presentence officer, testified that he was drug-free at the sentencing hearing and could pass a drug screen. Though it does not appear that the Defendant has ever sought treatment for his drug usage, the extent of his drug problem has not been determined, and he, as of now, has not been referred for participation in any drug treatment program. At the sentencing hearing, the Defendant indicated his understanding that he could not use any form of illegal substances if granted release into the community.

Also, as noted above, the trial court's emphasis on the Facebook image as the primary factor in denying judicial diversion is not supported by the record. Nonetheless, we note the following as it pertains to the image given that it was the focus of the trial court's ruling. During questioning about the photograph at the sentencing hearing, the Defendant acknowledged that he posted the picture in question to his "old" Facebook page. He also stated that it was not him in the image, and he denied knowing who it was. He explained that when he posted it, he was trying to portray a certain image. The trial court emphasized the Defendant's admission that he posted the image to his Facebook account and his denial of knowing the identity of the individual in the picture, which, in the trial court's view, did not show that he had "learned anything from this tragedy." Implicitly, these statements by the trial court appear to be a commentary on the Defendant's credibility at the sentencing hearing. However, as noted above, the exact provenance of the image was never established, nor was the identity of the individual therein. Moreover, the conduct at issue here was accidental in nature. We conclude that the posting of this photograph is entitled to little weight, if any, in assessing the Defendant's amenability to correction.

The Defendant accepted responsibility for his actions, expressed remorse, and pleaded guilty to reckless homicide. However, the Defendant also used marijuana and ecstasy while on bond for this offense and his credibility was questionable, at times, at the sentencing hearing. For these reasons, we weigh this factor as neutral regarding the Defendant's suitability for judicial diversion.

### 2. Circumstances of the Offense

The second factor in the diversion analysis relates to the circumstances of the offense. This court has determined that "the circumstances of the offense may alone serve as the basis for denial" of judicial diversion. *State v. Kyte*, 874 S.W.2d 631, 634 (Tenn. Crim. App. 1993). However, as noted earlier in this opinion, where the legislature has not excluded from diversion eligibility an offense that involves a death, a trial court may not deny diversion simply because a death has occurred. *Turner*, 2014 WL 310388, at *6

Nonetheless, "the trial court may consider and weigh the 'circumstances leading to death.'" *Sheets*, 2023 WL 2908652, at *9 (quoting *State v. White*, No. W2017-01649-CCA-R3-CD, 2018 WL 3239629, at *4 (Tenn. Crim. App. July 3, 2018); *Spang*, 2015 WL 510921, at *4). Conversely, the trial court should also be permitted to consider and weigh circumstances immediately succeeding the death. Additionally, "[a] trial court may also consider 'a victim impact statement as it reflects on the circumstances of the offense.'" *Id*. (quoting *State v. Killgo*, No. E2020-00996-CCA-R3-CD, 2022 WL 2286935, at *8 (Tenn. Crim. App. June 24, 2022), *no perm. app. filed*).

Here, the acts of the entire group of these young men that led to the victim's death were less than estimable. They went to a party and stole the gun, along with a watch and shoes, from the house after the party's hostesses had "passed out." They subsequently took the items back to the victim's dorm room and began to divide them up to sell at a pawnshop. The victim first handled the weapon, but being unable to successfully operate the weapon, then asked the Defendant to figure out how the gun and its safety mechanism worked. Apparently, all parties involved believed the weapon was a pellet gun. The Defendant described, "When I opened it the first time, I guess it had like a safety mechanism so you couldn't pull it at first. It was like hard. And I snapped it open and snapped it back, and at that time it went off." By all accounts, this was an accidental shooting. The victim was not bleeding at that time, and collectively, no one in the group realized the seriousness of the victim's injury. The RA came to the dorm room to check on the gunshot noise that came from inside and left after a discussion with the victim's roommate. Then, over thirty minutes passed before the victim left to go to the bathroom. During this time, the victim and the Defendant devised a story to protect their scholarships and not get "kicked out of school": "[T]he story was we all had got drunk and did a few things the night before, and [the victim] was having a reaction to what we had did the night before." It was not until the Defendant went to check on the victim, who had been gone to the bathroom for a lengthy period of time, that he became aware that the victim was bleeding and in need of medical assistance. The Defendant immediately went to the RA and summoned for help. The Defendant's actions in ridding the dorm room of various items following the victim's being taken to the hospital was also less than laudable.

While these circumstances are tragic, the Defendant's actions were not intentional. However, the Defendant's behavior both before and after accidentally shooting the victim were concerning. For these reasons, we conclude that this factor weighs against diversion.

### 3.      Criminal Record

The third factor in the diversion analysis examines the accused's criminal record. In weighing this factor, a trial court may consider convictions and unconvicted criminal behavior, such as unlawful substance use. *See State v. Beverly*, 894 S.W.2d 292, 293-94 (Tenn. Crim. App. 1994) (holding, in the context of judicial diversion, that prior criminal behavior involving marijuana use may be considered in making the diversion decision).

The Defendant has no criminal record history. He has one Davidson County arrest for resisting arrest, but the charge was nolle prosequied. He reported to the presentence officer that he used marijuana daily, with his last usage being the day before his interview for the presentence report. He also testified that he used marijuana and ecstasy to "cope" with this incident. The Defendant indicated that he understood he would be required to cease any illegal drug usage while on any type of release into the community. Despite the Defendant's drug usage, the Defendant's minimal criminal record weighs in favor of judicial diversion in this case. *See, e.g., Eakes*, 2023 WL 5605636, at *10 (concluding same under similar facts).

### 4.      Social History

The fourth factor in the diversion analysis considers the accused's social history. In weighing this factor, trial courts may consider, among other things, the defendant's age, general reputation, education, employment, home environment, community involvement, and family relationships and responsibilities. *King*, 432 S.W.3d at 328; *Washington*, 866 S.W.2d at 951. "The law generally views these considerations as a proxy for stability to assess whether effective rehabilitation is likely." *Sheets*, 2023 WL 2908652, at *10. "Apart from these considerations, though, these factors should not be used to favor those who may come from certain backgrounds or to condemn those who may not." *Id*. (citing Tenn. Code Ann. § 40-35-103(3)).

In this case, the Defendant was eighteen years old at the time of the victim's death. He played multiple sports in high school, earned a competitive engineering internship with Northrop Grumman, invented a "concussion helmet," and graduated as class salutatorian. He also received an academic scholarship to TSU where he studied mechanical engineering with a concentration in thermodynamics. He had completed three semesters of college for a total of thirty-two credit hours and hoped to return to college to study thermodynamics and rocketry. He was employed at the time of the sentencing hearing, working two part-time jobs. The Defendant appeared to have the support of his grandmother and the father of one of his high school friends, as well as the respect of his former principal and the

Director of AOC Commercial Operations at Collins Aerospace. His current co-worker and roommate testified on his behalf. The fact that the Defendant grew up in a rough area of Chicago and was the random victim of drive-by shooting should not be held against him. In addition, the risk and needs assessment scored the Defendant "low" in the employment and education categories. We conclude that the Defendant's social history weighs heavily in favor of granting diversion.

### 5. Physical and Mental Health

The fifth factor in the diversion analysis examines the accused's physical and mental health. This factor weighs neutrally where nothing "in the record reflects anything of note regarding the [d]efendant's mental and physical health." *State v. Dycus*, 456 S.W.3d 918, 931 (Tenn. 2015). "It also may weigh neutrally where no physical or mental health condition prevents the defendant from complying with probation conditions." *Sheets*, 2023 WL 2908652, at *11 (citing *State v. Hutchins*, No. E2016-00187-CCA-R3-CD, 2016 WL 7378803, at *5 (Tenn. Crim. App. Dec. 20, 2016)).

In this case, the record shows that the Defendant was in good physical and mental health despite his being shot six times by a drive-by shooter on June 21, 2020. Although there was some indication that the Defendant was experiencing anxiety since the victim's death, the Defendant did not report any mental health issues or diagnoses to the presentence officer. In addition, the risk and needs assessment scored the Defendant "low" in the attitudes and behaviors and mental health categories. The Defendant has demonstrated the physical and mental ability to comply with the conditions of release into the community. As such, we determine that this factor weighs neutrally in the diversion analysis. *See, e.g., Sheets*, 2023 WL 2908652, at *11 (concluding same under similar facts).

### 6. Deterrence

The sixth factor in the diversion analysis examines the deterrence value to the accused as well as others. In the diversion context, concepts of general deterrence, or the deterrence to others, and specific deterrence, or the deterrence value to the accused, are at least of equal importance. *See Sheets*, 2023 WL 2908652, at *11 (citing *Electroplating*, 990 S.W.2d at 229).

Though the Defendant pleaded guilty to a reckless act, the shooting, by all accounts, was accidental in nature. All involved, including the victim, did not appear to appreciate the gravity of the situation or the seriousness of the victim's injuries. There is no general need to deter accidental conduct, as it is unlikely to occur again. Moreover, the Defendant

does not have any incidences of remotely similar conduct either before or after the victim's death. Accordingly, we conclude that the factor weighs in favor of granting diversion. *See Eakes*, 2023 WL 5605636, at *11 (concluding same under similar facts).

### 7. Interests of the Public and the Defendant

The final factor in the diversion analysis examines whether judicial diversion will serve the interests of the public as well as the accused. A trial court may consider diversion as advancing the interests of the accused "when a felony conviction may impair future employment, or when necessary to avoid the stigma of a felony conviction[.]" *Sheets*, 2023 WL 2908652, at *12 (internal citations omitted). On the other hand, the interests of the public may not be served "where granting diversion would depreciate the seriousness of the offense, or where the collateral consequences of a conviction would protect the public[.]" *Id*. (internal citations omitted).

The record here reflects that the felony conviction would prevent the Defendant from returning to school and seeking employment in his chosen field. The Defendant testified that if able, he wanted to return to college and study thermodynamics in the hopes of working for Northrop Grumman on airplanes, but he indicated that he would be unable to work for such a company with this conviction on his criminal record. He indicated that going forward, his goal was to finish school, in part as a way to honor the victim's memory.

The victim impact evidence presented at the sentencing hearing shows the significant impact the Defendant's actions had on the victim's family, and we are unable to adequately express the extent of the family's loss. However, though this case involves a homicide, the Defendant's actions were accidental in nature as noted above. It does not appear that granting judicial diversion would depreciate the seriousness of the offense in this case.

Without diversion, the Defendant would have to deal with the stigma of a felony conviction and the collateral consequences of having said conviction forever on his criminal record. Given the Defendant's youth and talents, he will be permitted this limited second chance. If he is successful on diversion, he will be restored fully to useful and productive citizenship. Accordingly, we conclude that judicial diversion will serve the interests of the public, as well as the Defendant in that the public has an interest in confining criminals who are a danger to society, which the Defendant is not, and in that the Defendant has an interest in being able to move forward with his life in a law-abiding and constructive manner. *See Eakes*, 2023 WL 5605636, at *11 (concluding same under similar facts).

Our decision today in no way seeks to negate or diminish the enormity of the victim's death or the suffering his family has, and will continue to, endure. That said, the factors the courts are required to consider when granting or denying judicial diversion weigh in favor of the Defendant's being granted judicial diversion. Accordingly, we reverse the trial court's judgment and grant judicial diversion. The matter is remanded to the trial court for an order of judicial diversion with appropriate conditions and for an appropriate term. Because we grant judicial diversion, it is not appropriate at this time to review the length of the Defendant's sentence or the denial of an alternative sentencing given that the grant of judicial diversion is the decision to defer a sentence.

## III. CONCLUSION

For the foregoing reasons, we reverse the trial court's judgment and grant the Defendant judicial diversion. The matter is remanded for entry of an order of judicial diversion and for imposition of a term and the conditions of judicial diversion.

_____
KYLE A. HIXSON, JUDGE